UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

| | |
|---|---|
| Crystal Cruz, | **JURY TRIAL DEMANDED** |
| Plaintiff, | |
| -against- | **21-cv-1999** |
| | **VERIFIED COMPLAINT** |
| City of New York; New York City Health and Hospitals Corporation; Nicole Phillips, in her  official and individual capacities; Dana Stein, in her  official and individual capacities; and Blanche Greenfield, in her  official and individual capacities, | |
| Defendants. | |

------------------------------------------------------------------------X

Plaintiff Crystal Cruz (hereafter "Plaintiff"), by her attorney, Anne Leahey, Esq., hereby brings this complaint against the City of New York; New York City Health and Hospitals Corporation ("HHC");  Nicole Phillips, in her  official and individual capacities; Dana Stein, in her  official and individual capacities, and Blanche Greenfield, in her  official and individual capacities (collectively the "Individual Defendants"); and, in support thereof, alleges as follows:

## INTRODUCTION

1. Plaintiff bring this action for discrimination based on disability and age and for retaliation for complaining about disability-based discrimination and gender-based discrimination.  Starting in December of 2018 and continuing to date, HHC has denied Plaintiff the following reasonable accommodations for her physical disabilities and post-traumatic stress syndrome (PTSD): (a) working hours that are limited to an 8-hour shift in a 24-hour period; (b) the provision of an ergonomic chair; (c) a position that does not require heavy lifting and overhead lifting; and (d) assignment to a different location than the work location of the person

1

who sexually harassed her. HHC's failure to date to to reinstate Plaintiff in a position upon return from medical leave for work-related injuries which provides these reasonable accommodations is part of a continuing pattern of unremedied specific and related instances of discrimination and retaliation based on Plaintiff's age, gender, and/or disabilities that began when she complained about sexual harassment in September of 2015.

2.     Accordingly Plaintiff alleges herein violations of Title I of the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. 12111, *et seq.*, and Title V, Section 503 of the ADA, 42 U.S.C. 12203; the Age Discrimination in Employment Act (ADEA), 29 USC §§ 621-634; Title VII of the Civil Rights Act of 1964, 42 USC § 2000e, *et seq.*; the New York State Human Rights Law, Executive Law§ 290, *et seq.*; and the New York City Human Rights Law, NYC Administrative Code §8-107.

## THE PARTIES

3.     Plaintiff Crystal Cruz is an employee of the New York City Health and Hospital Corporation ("HHC"), who currently resides in Bronx, NY. At all relevant times, Plaintiff met the definition of "employee" and/or "eligible employee" under all applicable statutes.

4.     Defendant City of New York is and has been a municipality in the State of New York.

5.     Defendant HHC is a public, domestic not-for-profit corporation with its principal place of business located at 125 Worth Street, New York, New York 10013.

6.     Nicole Phillips is an Equal Employment Officer ("EEO") Regional Director at HHC, and works at the following location: Lincoln Hospital, Human Resource Department, Office of the EEO Officer, 2nd Floor, 234 East 149th Street, Bronx, NY 10451; telephone

number: (718) 579-6104. At all relevant times, Phillips was authorized to act on behalf of HHC, and she participated directly in the employment decisions and wrongful actions taken against Plaintiff.

7.      Defendant Dana Stein is employed as an Equal Employment Officer at HHC and works at the following location: Jacobi Medical Center, Human Resource Department, Office of the EEO Officer,  Building # 4, Room # 5N16, 1400 Pelham Parkway, Bronx, NY 10461; telephone number: (718) 918-5244. At all relevant times, Stein was authorized to act on behalf of HHC, and she participated directly in the employment decisions and wrongful actions taken against Plaintiff.

8.      Blanche Greenfield supervises the Equal Employment Officers at HHC and works at the following location: NYC Health and Hospitals Corporation Legal Department, Central Office/EEO Legal Department, Room # 527, 125 Worth Street, New York, New York 10013; telephone numbers: (212) 788-3311 and (212) 788-3300. At all relevant times, Greenfield was authorized to act on behalf of HHC, and she participated directly in the employment decisions and wrongful actions taken against Plaintiff.

## JURISDICTION AND VENUE

9.      This Court has federal subject matter jurisdiction over Counts One, Two, Three, and Four of the Complaint pursuant to 28 U.S.C. §§ 1331and 1343(a)(4).

10.     This Court has supplemental jurisdiction over Counts Five, Six, Seven, and Eight of the Complaint pursuant to 28 U.S.C. § 1367.

11.     On December 14, 2020, the United States Equal Employment Opportunity Commission issued to Plaintiff a letter authorizing her to institute a civil action against HHC

under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, <u>et seq</u>. <u>See</u> attached notice.

12.     On December 14, 2020, the United States Equal Employment Opportunity Commission issued to Plaintiff a letter authorizing her to institute a civil action against HHC under  Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. 12111, *et seq.*, and, Title V, Section 503 of the Act, 42 U.S.C. 12203. <u>See</u> attached notice.

13.     On December 14, 2020, the United States Equal Employment Opportunity Commission issued to Plaintiff a notice authorizing her to institute a civil action against HHC under the Age Discrimination in Employment Act (ADEA), 29 USC §§ 621-634. <u>See</u> attached notice.

14.     This Court has personal jurisdiction over the Defendants because they transact business within the State of New York, and have engaged in wrongful acts within the State of New York.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and injury giving rise to Plaintiff's claims occurred in this district.

## <u>ADMINISTRATIVE PROCEDURES</u>

16.     Pursuant to NYCHRL § 8-502, unless Defendants waive service, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights, 22 Reade Street, New York, NY 10007, and the New York City Law Department, Office of the Corporation Counsel, 100 Church St, New York, NY 10007, thereby satisfying the notice requirements of that section.

## FACTUAL BACKGROUND

17.    Plaintiff is a certified civil servant with seniority in the position of Clerical Associate Level 3 who has been employed by HHC since approximately 1991. During her employment at HHC, she has worked exclusively at Jacobi Medical Center (Jacobi), 1400 Pelham Parkway, Bronx NY 10461.

### Background Facts:
### 1992-2013 Employment at HHC

18.    After initially working as a ward clerk, Plaintiff worked in accounts payable as an Accounts Payable Clerk or Accounting Associate from around 1992 until around 2004, when she was transferred to the Medical Records Department, where she worked as the Secretary to the Director of Medical Records.

19.    In 2001, Plaintiff underwent spinal lumbar surgery, after which her surgeon, Dr. Ramesh Babu, authorized her return to work with the reasonable accommodation of an ergonomic chair. Jay Weinman, the Comptroller for HHC Jacobi, promptly authorized the purchase of the chair, which was in place when Plaintiff returned to work from  medical leave and which she used until going out on medical leave in 2016.

20.    From approximately 2005 until 2012, Plaintiff worked as Secretary/Office Manager for the Director of Medical Records. This was an out-of-title position with onerous responsibilities that included the following: managing timesheets and payroll, managing office files including confidential employee files, inventorying supplies, purchasing department supplies and services, maintaining a $500,000.00 yearly budget, maintaining the Director's calendar, scheduling meetings, organizing documents for meetings, handling all incoming and outgoing correspondence and telephone calls, making  call tickets for the Environmental and

Engineering Departments, and covering for the Executive Secretary of the CFO of the Finance Department. Plaintiff capably carried out these duties, demonstrating her competence and work ethic.

21.     Starting iIn July of 2011, Plaintiff was placed on medical leave due to neck and spine injuries incurred in a car accident. When Plaintiff returned to work in January of 2013, her prior position as Secretary to the Director had been filled, and she was assigned to the position of Systems Analyst. In this position, she directly reported to Edgar Cruz, Assistant Director of Medical Records; he reported to the Director of Medical Records, Myrtle Greene-Walcott.

**Work Accident on 12/17/13:  Injuries and Accommodation**

22.     On the morning of December 17, 2013, Plaintiff slipped and fell backwards on the ice in front of the Jacobi Medical Center as she was about to report to work. As a result of the fall, she seriously injured her hands and ripped the inside of her right shoulder. Her right hand, which is her dominant hand, developed stenosing tenosynovitis, also known as trigger finger. In addition, she suffered De Quervain Syndrome in the thumb area of the right hand and damage to the right middle finger. On the left hand, she damaged and dislocated the Basal joint in the thumb. She sprained five muscles in her chest and back and tore the soft tissue in the rotary cuff of the right shoulder. Because of these injuries, Plaintiff was placed on approved medical leave through Workers Compensation.

23.     As a result of her workplace accident, Plaintiff's right hand is permanently injured; trigger finger prevents her from picking up a heavy pot or to  twisting open the lid of a jar. She wears a permanent brace on her left hand to prevent the thumb from re-dislocating. In addition, she has permanent restrictions with lifting and range of motion above her head, and she

experiences pain if she overuses or overworks her hands and arms

24.     In January of 2015, Plaintiff returned to her position at Jacobi as a Systems Analyst in the Medical Records Department where she was provided with the following accommodations: she was allowed to work and complete assignments at her own pace so as not to exacerbate the issues in her hands; if her hands were bothering her, she was allowed to take breaks; and she was provided with the continuing use of the previously issued ergonomic chair. With these minor accommodations, Plaintiff was able to complete her job duties on a daily basis, without exacerbating her pre-existing injuries. She was happy in the position of Systems Analyst, took pride in her work, and enjoyed good working relationships with her colleagues.

**September 9, 2015: Sexual Harassment Incident and Report**

25.     All of this changed on or about September 9, 2015. Shortly after Plaintiff arrived at work that day, Rosa Durand, a Clerical Associate Level 4, who worked in the same cubicle area as Plaintiff, said to Plaintiff, "What happened to the rest of your skirt?" Plaintiff continued to her desk feeling confused by the question as she was dressed appropriately for the office in a loose flair skirt that fell just above the knee.

26.     Plaintiff had to walk by Rosa Durand's cubicle about five or six times during the course of that day to retrieve reports from the printer. Everytime Plaintiff passed Durand's cubicle, the latter would whistle or say, "Wow!" Plaintiff felt increasingly disturbed by this harassment. Finally, Plaintiff told Durand to stop, saying, "Enough is enough!" In response, Rosa Durand laughed.

27.     In the late afternoon, as Plaintiff was walking towards her workspace, Durand got up from her desk, got down on the floor, looked under Plaintiff's skirt, and announced, "I know

the color of your panties! It's pink!" Plaintiff replied, "You're disgusting!" Durand just laughed.

28.    Durand's behavior was seen and heard by three employees, Darren Lee, Gina Sandler, and Kushma Amechad. Lee, the only male witness, remarked, "That's not right!"

29.    Plaintiff was terribly embarrassed and upset by this incident. Because her immediate supervisor, Edgar Cruz, was not available, she reported the incident to the Assistant Coordinating Manager, Sandra Valano.  At Sandra Valano's directive, Plaintiff reported the incident to Director Myrtle Greene-Walcott. After that, because Plaintiff's hands were shaking so badly, she was sent to Employee Health, where, due to extremely high blood pressure, she was not allowed to leave until her blood pressure dropped. The treating physician provided her with an application for Workers Compensation for PTSD and explained how to complete and file the application.

30.    Upon returning to work, Plaintiff gave the completed Workers Compensation application to Director Greene-Walcott, who signed it, after which Plaintiff filed the paperwork at Employee Health.

**Discrimination and Retaliation for Reporting Sexual Harassment**

31.    Plaintiff's managers discriminated and retaliated against her for reporting the sexual harassment described above by moving her  out of the job she loved as a Systems Aanalyst, stripping her of the reasonable accommodations she had previously been accorded (except for the ergnomic chair), and assigning her to work that exacerbated her physical injuries and subjected her to further harassment by her abuser.

32.    On information and belief, Durand was never disciplined and never suffered any repercussions for sexually  harassing  Plaintiff,  even  though  Plaintiff  had  filed  paperwork

8

regarding the incident with her department and with Labor Relations.

33.     Instead of moving Durand -- the harasser -- to a different work location, HHC, in a punitive expression of disability and gender discrimination and retaliation, moved Plaintiff from her position as a Systems Analyst on the first floor to a position in the basement filing documents. Feeling humiliated, as if she was being punished or fired, Plaintiff packed up her personal belongings in front of her colleagues.

34.     Plaintiff's retaliatory assignment to the file room allowed Durand's harassment to continue unchecked. Because Durand was the supervisor for Chart Assembly, Durand's job placed her constantly in the file room where Plaintiff frequently worked in isolation.  When Durand entered the file room, she would sing, smirk, and walk away laughing, in a passive-aggressive manner, going out of her way to make Plaintiff uncomfortable.

35.     Moreover, Plaintiff's retaliatory assignment to the filing room badly exacerbated her pre-existing physical disabilities. She had trouble lifting charts above her head, even with the help of a stool. She also could not keep up with the filing because she was unable to straighten the trigger finger. Her hands became sore and swollen, symptoms she had not experienced in her prior positions as a Systems Analyst.  She returned to her doctor, who, after examining her, wrote a note to HHC excusing Plaintiff from overhead lifting and carrying anything heavy.

36.     As a result of the doctor's note, management begrudgingly moved Plaintiff from the file room after she had been there for about two weeks to a position as a Call Operator. However, Plaintiff's new assignment as a Call Operator continued HHC's unaddressed pattern and practice of specific incidents of disability and gender discrimination and retaliation inasmuch as the new assignment continued to deprive her of the reasonable accommodations she had been

given as a Systems Analyst (except for the ergonomic chair), failed to accommodate her physical disabilities in any way, and failed to address her need to be safeguarded from Durand's sexual harassment.

37.    When Plaintiff was assigned to the call room, Durand continued to sexually harass Plaintiff. Even though there was a printer close to Durand's cubicle, Durand frequently used the printer in the call operations area with the excuse that her printer was broken. When in the call room, Durand would talk very loudly and exaggeratedly so as to make her presence known to Plaintiff. When Durand was in the hallways and would see Plaintiff, if no one else was around,  Durand would passive aggressively hum and laugh.

38.    Moreover, Plaintiff had to enter Durand's office area twice a day to sign in and out of timesheets. When Plaintiff arrived at work at 8:00 A.M., no supervisors were present as the Director and Assistant Directors came in at 9:00 A.M. However, Durand, who arrived at 7:00 A.M. was already present. On multiple occasions, after Plaintiff signed in, Durand would stalk Plaintiff, following Plaintiff out of the area and walking immediately behind her.

39.    Essentially, Durand behaved angrily and intimidatingly, going out of her way to make Plaintiff miserable and uncomfortable at every possible opportunity. Plaintiff reported Durand's taunting behavior to  her supervisor, Edgar Cruz, but to no avail.

40.    Plaintiff specifically related to Edgar Cruz the sexual harassment she experienced when she signed her  timesheet in the morning, requesting that he change the location of the timesheets. Even though the sign-in sheets had previously been in Edgar Cruz's work area, he told Plaintiff that their location could not be moved, thereby denying her request for a reasonable accommodation for the PTSD caused by sexual harassment and continuing the pattern and

practice of disability and gender discrimination and retaliation.

41.    In a continuation of HHC's pattern of unremedied disability and gender discrimination and retaliation, no one in management, despite Plaintiff's complaints, made any effort to prevent Durand from continuing to harass Plaintiff.

42.    Plaintiff was on edge all the time, even when not at work. She had frequent nightmares related to the stress caused by Durand's continuing harassment.  Commuting to work was extremely difficult for Plaintiff, because of Plaintiff's anticipation of the sexual harassment she would face on arrival. Frighteningly, between January and March of 2016, as the harassment and stress escalated, Plaintiff blacked out while driving to work on several occasions, and found on arrival that she had no memory of her commute.

43.    Further, Plaintiff's new position as a Call Operator badly exacerbated her physical disabilities. Her duties required her to assign medical record numbers for the clinical departments or for the ER and to provide this data to departments that dealt with new patients or patients with changed demographics. Because Plaintiff took in calls involving both Jacobi and North Central Bronx Hospital, her call volume was extremely heavy. She never had an opportunity for a break, an accommodation Plaintiff had previously been accorded when she worked as a Systems Analyst. The result was that her hands  became chronically stiff and swollen.

44.    Plaintiff's hands had not been swollen and stiff when she worked as a Systems Analyst. As discussed above, as a Systems Analyst, Plaintiff had taken pride and joy in being able to complete all tasks after being given minor, reasonable accommodations. It was only as a result of Durand's harassment that Plaintiff was removed from what had been an ideal position as a Systems Analyst and punitively placed in positions, first in the file room and then in the call

room, that worsened her physical disabilities.

45.     Plaintiff discussed what was happening to her hands with her doctor who advised her to seek to adjust her work hours so that she could come in later in the morning to allow her to take time in the morning to soak her hands  and do hand exercises. Therefore, Plaintiff asked Director Myrtle Greene-Walcott for permission to change her working hours to allow for a later start. The Director said she needed to speak with Plaintiff's supervisor, Edgar Cruz, but  never took any action with respect to Plaintiff's request.

46.     Subsequently, Director Myrtle Greene-Walcott was fired, after which Plaintiff, on two occasions, asked Gail Gantt, the Acting Director of Medical Records, for adjusted working hours. On each occasion, Gantt said she was too busy to have a conversation with Plaintiff about different working hours, even though HHC had accommodated other employees by giving them flexible working hours. Gantt's refusal to consider Plaintiff's request for the reasonable accommodation of different working hours on the basis that the Director was "too busy," is a further reflection of HHC's disability and gender discrimination and retaliation towards Plaintiff.

47.     The combined effect of HHC's discriminatory and retaliatory failure to address Plaintiff's request for a different work schedule and of HHC's failure to check Durand's continuing sexual harassment of Plaintiff was to make the working environment intolerable and insufferable for Plaintiff. Instead of trying to remedy this situation, Edgar Cruz advised Plaintiff to go back to her doctor to seek placement on medical leave.

**2016 Medical Leave**

48.     On March 16, 2016, Plaintiff was placed on approved medical leave through Workers Compensation because of her physical problems. At the same time, her physician, Dr.

Roy G. Kulick, MD, the Director of Hand and Upper Extremity Surgery at Montefiore Medical Center, treated her hands with a proven, but time-consuming, innovative therapy, involving laser, ultrasound treatment, massage, and hot wax treatments. Plaintiff was also, at this time, fitted with a brace for her left thumb.

49.     Although Plaintiff has permanent damage and disability, Dr. Kulick's therapy significantly improved her hands. On November 19, 2018, Plaintiff submitted a letter to her Equal Employment Officer at HHC which said that she was deemed ready to go back to work on December 10, 2018. Dr. Kulick specified that Plaintiff's return to work was conditioned on her working an 8-hour shift in a 24-hour period and working in a position that did not require heavy lifting and overhead lifting. In addition, Plaintiff provided HHC, on or about November of 2018, with an updated notice from her surgeon, Dr. Ramesh Babu, stating that she had a continuing need for an ergonomic chair.

50.     While Plaintiff was out on medical leave, in addition to receiving treatment through Workers Compensation treatment for her hands, she received treatment through Workers Compensation for PTSD. On or about April or May of 2016, Plaintiff appeared before the Workers Compensation Board for a  hearing regarding her work-related  PTSD resulting from Durand's sexual  harassment. Upon prevailing in her PTSD claim, Plaintiff, on or about June of 2016, commenced treatment for PTSD with a doctor authorized by Workers Compensation.

51.     For approximately a year, Plaintiff saw a psychologist once a week. As Plaintiff's anxiety and depression subsided, she began to see the psychologist every two weeks and then every month. Plaintiff continues to see a psychologist once a month because of continuing anxiety.

52.    In November 2018, when Dr. Kulick wrote to HHC authorizing Plaintiff's return to work, her psychologist also wrote to HCC recommending that Plaintiff, upon returning to work, be assigned to a facility where her harasser (Durand) did not work.

### EEO Officers Nazario, Phillips and Stein

53.    Months before being authorized to return to work, Plaintiffs discussed the accommodations that she would need when she was deemed ready to return to work with Luz Nazario, the Equal Employment Officer at Jacobi. In this context, on or about April of 2018, Plaintiff spoke with Nazario about returning to work at a different facility than the one at which Durand worked.

54.    During discussions about Plaintiff's return to work, Nazario informed Plaintiff about the mechanics of the reinstatement process, explaining that Plaintiff should apply for any position which interested her, and that Plaintiff, after submitting a job application, should inform Nazario, who would then contact Human Resources at the hospital in question to arrange for an interview. Nazario indicated that because Plaintiff had a long, unblemished employment record with HHC, her qualification for positions would not be questioned; in this regard, Plaintiff's successful performance of duties outside of her title, when she worked as Secretary/Office Manager for the Director of Medical Records from about 2005 until 2012, demonstrated that she was well-qualified to assume any available clerical position at HHC. Therefore, Nazario told Plaintiff that discussions during job interviews would center on the accommodations which Plaintiff needed.

55.    Nazario was a helpful and competent civil servant, who was well-versed in Plaintiff's needs. Plaintiff provided Nazario on a monthly basis with the doctors' notes that were

necessary to extend Plaintiff's leave through Workers Compensation, and the leaves were duly extended in a timely way.

56.     However, Nazario resigned from her position somewhere between May and July of 2018 and was therefore not available to facilitate Plaintiff's reinstatement in December of 2018. Because the Equal Employment Officer position at Jacobi was unoccupied for several months after Nazaario left, Plaintiff had to file doctors' notes with the workers compensation director in HHC's central office in order to get her leave extended.

57.     Around September of 2018, Plaintiff was assigned to Nicole Phillips, the Equal Employment Officer at Lincoln Hospital. Phillips was incompetent and could not access Plaintiff's previously-filed paperwork, so Plaintiff was forced to send Phillips all of Plaintiff's paperwork.

58.     Plaintiff was assigned to a third Equal Employment Officer, Dana Stein, who became the Equal Employment Officer at Jacobi in November 2018, around the time that Plaintiff's doctors authorized Plaintiff's return to work. Plaintiff had a lot of trouble communicating with Stein, who rarely returned Plaintiff's phone calls.  Stein admitted to being overwhelmed and frustrated with her work load and said that she did not know how the system worked. In response to Plaintiff's request to speak with someone else, Stein gave Plaintiff contact information for Blanche Greenfield, who supervised the Equal Employment Officers at HHC. Plaintiff contacted Blanche Greenfield,  but Greenfield did not get back to Plaintiff.

59.     According to HHC policy, the role of the Equal Employment Officer is to "receive requests for accommodations, and recommend appropriate action to the agency head

regarding EEO-related issues."[1] However, EEO Officer Dana Stein did not carry out these responsibilities in regard to Plaintiff, as shown next.

60.    Pursuant to the reinstatement procedure that had been outlined by former Equal Employment Officer Nazario, Plaintiff applied for different job positions and sent Stein copies of the applications. However, Stein never followed up on these applications by helping Plaintiff get interviews and by discussing Plaintiff's accommodation needs with potential jobs. Therefore, for every job for which Plaintiff applied, she had to do the follow-up work and schedule her own interviews. Stein's only input, as shown below, was to arrange for Plaintiff to interview at three jobs, for which Plaintiff did not apply; significantly, two of these three jobs were unsuitable for Plaintiff as they did not accommodate her medical needs.

61.    During the twenty-seven month period since December of 2018 when Plaintiff's doctors authorized her return to work, HHC has not provided her with a position that meets her need for reasonable accommodations. Moreover, HHC has offered her scant opportunity to interview for suitable positions --  Plaintiff has applied to approximately 50 positions but has been on only five interviews as outlined next.

### The First Interview – Arranged by Plaintiff

62.    Plaintiff's first interview took place in November 2018, around the time she wrote HHC explaining that her doctor had deemed her ready to return to work in December 2018. Plaintiff applied for the position in question, which was at Queens Hospital,  and arranged for the interview without assistance from Stein. At the interview, as she did at every interview,Plaintiff made sure that the interviewer knew Plaintiff would be a transfer and provided Stein's contact

---

[1] See https://www1.nyc.gov/assets/dcas/downloads/pdf/agencies/nyc_eeo_policy.pdfmi.

information as a reference. Stein never followed up with Plaintiff after this interview or after any other interview, demonstrating Stein's abject failure to assist Plaintiff in being reinstated in a position with reasonable accommodations.

63.     The position was a perfect fit for Plaintiff's skills and would have accommodated all of her reasonable needs. However, the position was offered to a different candidate. On information and belief, the job was not offered to Plaintiff due to discrimination based on disability and age and due to retaliation based on her complaints of disability-based and gender-based discrimination.

**Inappropriate Job Prospect - Pushed by Equal Employment Officer Stein**

64.     Although Stein was supposed to be facilitating Plaintiff's reinstatement with reasonable accommodations, Stein did nothing to facilitate the process until almost six months after Plaintiff was authorized to return to work. In May 2019, Stein arranged for Plaintiff to interview in the Emergency Room Department of North Central Bronx Hospital, a job that would have required Plaintiff to work a mandatory double shift. Since Plaintiff's medical condition prohibited her from working a double shift, she declined to go on the interview. Stein responded by asking Plaintiff three times if Plaintiff would accept the position; each time, Plaintiff explained her disability limitations and said that the job did not accommodate her need to work no more than an 8-hour shift in a 24-hour period. In response, Stein retorted that the limitation which prevented Plaintiff from working more than eight hours in a twenty-four hour period was not in the file and that Plaintiff would have to update the paperwork. Even though the paperwork had been on file at the time Nazario was functioning as Jacobi's Equal Employment Officer Officer and Stein should have been conversant with it, Plaintiff was forced to get a new letter

from her doctor and provide it to Stein.

65.    After this, Plaintiff's trust in Stein was badly shaken, as it appeared to Plaintiff that Stein had tried to manipulate the situation to make it look as if Plaintiff was refusing a suitable position. Plaintiff believed that Stein was deliberately trying to sabotage Plaintiff's return to work due to discrimination based on disability and age and due to retaliation based on her complaints of disability-based and gender-based discrimination. Therefore, Plaintiff was careful to communicate with Stein only in writing.

**The Second Interview - Arranged by Plaintiff**

66.    Plaintiff arranged for her second interview without the assistance of Stein. It took place in July 2019 and was for a position at Metropolitan Hospital

67.    At Metropolitan Hospital, Plaintiff interviewed with two employees in the Human Resources Department, Raquel Ortiz and an individual named Dana (surname unknown), and provided them with Stein's telephone number as a reference. Plaintiff was hired on the spot as a transfer.

68.    At the interview, Plaintiff completed the paperwork required by the Human Resources Department for her employment at Metropolitan, including HIPAA forms needed by Employee Health Services to transfer Plaintiff's employee records from Jacobi to Metropolitan Hospital.

69.    At the end of the interview, Plaintiff was informed that she would receive a proposal letter, but Plaintiff never received the letter. After two weeks, Plaintiff followed up with a telephone call and was told that the Human Resources Department was in the process of sending the proposal letter. In August 2019, she called again to inquire about the proposal letter

and the start date, only to be told that she had not been chosen for the position and that another candidate had been chosen. Plaintiff never received written notification from Metropolitan informing that her application had been turned down. On information and belief, Plaintiff was denied this position, which she had been offered and for which she was well-suited, due to discrimination based on disability and age and due to retaliation based on her complaints regarding disability-based and gender-based discrimination.

### The Third Interview: for a Position Requiring Heavy Lifting – Arranged by Stein

70.     Stein arranged Plaintiff's third interview. It  took place in August 2019 and was for a position in the Health Information Management Department at Queens Hospital. Plaintiff was interviewed by a panel consisting of Media Oliver, the Director of Medical Records; the Assistant Director of Medical Records; and three others, employees in Human Resources and Labor Relations. During the interview, Plaintiff, to her shock and embarrassment, learned that the position would require her to stock and lift heavy charts in boxes, duties that were outside the physical limitations set by her doctor.

71.     At that point, Plaintiff had provided Stein with doctor's letters setting forth Plaintiff's physical disabilities and limitations. As a result, Stein was aware, or should have been aware, that Plaintiff's disabilities prevented her from performing the job at Queens Hospital. Under the circumstances, Stein's behavior was  unconscionable and evinced discrimination based on disability and age and retaliation based on Plaintiff's complaints regarding disability-based and gender-based discrimination

72.     After Plaintiff explained to Stein exactly why she could not accept the position, Stein displayed further disability animus by asking Plaintiff, whose injuries involved her hands

and arms, insensitive questions such as whether Plaintiff could walk up and down the stairs.

**The Fourth Interview – Arranged by Plaintiff**

73.    Plaintiff arranged for her fourth interview, which took place in November 2019, without assistance from Stein. It was for a position as a Clerical Associate 4 or Assistant Coordinating Manager at Metropolitan Hospital in the Environmental Services Department. Although Plaintiff is a Clerical Associate 3, she is certified for any clerical associate level and therefore was qualified to fill a position as a Clerical Associate 4. She interviewed with Robert Cepeda, Director of the Environmental Department, and gave him, as a reference, telephone contacts for Stein.

74.    Subsequently, Plaintiff received a letter in the mail informing her that another candidate had been chosen. On information and belief, Plaintiff was denied this position, for which she was well-suited, as a result of discrimination based on disability and age and retaliation based on Plaintiff's complaints about disability-based and gender-based discrimination.

**The Fifth Interview – Arranged by Stein**

75.    Stein arranged Plaintiff's fifth and final interview, which took place in January 2020. It was for a position at Elmhurst Hospital in the Registration Department. After interviewing with Gregory Almonte, Director of the Registration Department, Plaintiff was told that she would be called back for a second interview. However, Plaintiff was never contacted by anyone from Elmhurst about the job.

76.    On information and belief, Plaintiff was denied this position, for which she was well-suited, after being told she would be called back for a second interview, as a result of

discrimination based on disability and age and retaliation based on Plaintiff's complaints regarding disability-based and gender-based discrimination.

**Interview Synopsis**

77.     Stein's job duties required her to facilitate the provision of accommodations for Plaintiff's disabilities. However, during the twenty-seven month period during which Plaintiff has been attempting to return to work, Stein arranged only three interviews for Plaintiff. Of the three interviews, two were for positions which fell outside Plaintiff's physical limitations.

78.     At the very least, Stein should have been aware of Plaintiff's reasonable accommodation requests and should have sought positions that matched Plaintiff's needs. Instead, Stein placed Plaintiff in the humiliating position of interviewing for positions she could not perform and exposing her to resultant disability animus. Moreover, in the case of the interview at Queens Hospital in August of 2019, Stein's incorrect accusation that Plaintiff had refused an interview for a suitable job was really hurtful, as it could have prevented Plaintiff from continuing to receive Workers Compensation.

79.     On information and belief, Plaintiff was well-suited for all of the five positions for which she interviewed, with the exception of the position at Queens Hospital which required heavy lifting. Moreover, two of the positions simply failed to materialize without follow-up written communication. She was orally offered the position at Metropolitan Hospital and did all the paperwork required for the position; but then all communication from Metropolitan ended, and Plaintiff learned, only after repeated phone calls, that the position had been given to someone else. In the case of the position at Elmhurst Hospital, she was asked to come for a second interview, but then heard nothing further.

80.    Based on the foregoing, Defendants have been prevented Plaintifff fom being reinstated in a position which would have accommodated her disabilities, as a result of discrimination based on disability and age, and retaliation based on her disability-based and gender-based complaints,.

### EEOC Charge

81.    On August 17, 2020, Plaintiff filed an EEOC Charge against HHC. On information and belief, the EEOC Charge, upon being filed, was forwarded to Greenfield at blanche.greenfield@nychhc.org., thereby placing Defendants on notice of the allegations in the charge.

82.    After the EEOC Charge was filed on August 17, 2020, Defendants were aware, or should have been aware, of their illegal treatment of Plaintiff. Nevertheless, they continued to ignore her reasonable accommodations requests and failed to engage with her in an interactive process.

### Events Subsequent to Filing of EEOC Charge

83.    HHC was required to update Plaintiff's authorization for placement on medical leave on a monthly basis. In May of 2020, Plaintiff had received a letter from HHC extending her medical leave through July 30, 2020. However, as of July 30, 2020, Plaintiff had not received notice that her leave  was being extended beyond July 30, 2020. On August 17, 2020, Plaintiff emailed Equal Employment Officer Stein stating that (1) Plaintiff was still waiting for interviews for job positions for which she qualified and (2) Plaintiff was still waiting for notice that her reasonable-accommodation request for an extension of medical leave had been granted. Phillips, not Stein,  responded by sending Plaintiff an email which asked Plaintiff to telephone

Phillips.

84.    On August 18, 2020, Plaintiff emailed Phillips asking that Phillips communicate with Plaintiff by email. Plaintiff did not receive a response to this email until August 27, 2020, when Phillips sent Plaintiff an email requesting updated medical information. On August 31, 2020, Plaintiff replied that her injuries were permanent and there were no updates; Plaintiff further explained that HHC was in possession of all documents needed to address her reasonable accommodation request, inasmuch as Plaintiff had previously given these documents to Stein.

85.    On September 14, 2020, Phillips emailed Plaintiff asking if Plaintiff was unwilling to be assigned to any facilities, and, if so, to identify those facilities. On September 21, 2020, Plaintiff emailed Phillips stating that she was ready and willing to come back to work in any position that accommodated her disabilities and providing the names of the hospitals that were her top choices; Plaintiff reiterated that she had not received notice that her reasonable-accommodation request for an extension of medical leave had been granted. On September 21, 2020, Phllips emailed Plaintiff asking: whether Plaintiff's top choice facilities were the only ones at which she was willing to work; for information regarding additional positions to which Plaintiff might have applied; and whether Plaintiff was able to work nights, weekends, or overtime; and whether any additional restrictions applied.

86.    On September 23, 2020, Plaintiff responded that it appeared that Phillips was unfamiliar with Plaintiff's file and offered to provide the documents necessary to reconstruct Plaintiff's file. Plaintiff then again spelled out that she needed the following reasonable accommodations: working no more than 8 hours in a 24-hour period; an ergonomic chair; no overhead lifting and lifting no more than 5 pounds; and placement in a facility other than Jacobi

or North Central Bronx, the locations where Durand (the harasser) worked. Plaintiff further responded that, although she did not tell Stein that she (Plaintiff) was unable to work nights, weekends, or overtime, Plaintiff would check with her doctors to see if they were now recommending reasonable accommodations with respect to commute time and commute distance and with respect to working night shifts. Plaintiff reiterated that she still had not received notice that her reasonable-accommodation request for an extension of medical leave had been granted. Finally, Plaintiff provided Philips with a list identifying the open positions for which Plaintiff had applied.

87.    On September 23, 2021, Phillips requested confirmation that the job number for one of the jobs was correct, and on September 24, 2020, Plaintiff responded that the number was correct. On September 24, 2021, Philllips asked for the title and department of the particular job. On September 30, 2020, Plaintiff provided that information.

88.    On September 24, 2020, Phillips finally sent Plaintiff a letter granting her request for extension of her reasonable accommodation from August 1, 2020 through October 31, 2020. The letter inaccurately reflected the dates on which Plaintiff had submitted reasonable accommodation requests to HHC:

> On or about April 3, 2019, you provided this Office with documentation from your health care provider indicating that due to a qualifying disability, you can return to work with the following restrictions: you need to work at a facility other than Jacobi Medical Center or North Central Bronx Hospital. On or about June 20, 2019, you provided this Office with medical documentation indicating that due to a qualifying disability, you have the following additional restriction: you are unable to work more than eight (8) hours in a twenty-four (24) hour period. On or about September 2, 2019, you provided this Office with medical documentation indicating that due to a qualifying disability, you have the following additional restriction: you cannot do overhead lifting or heavy lifting over five (5) pounds.

In fact, Plaintiff had presented the above requests for reasonable accommodations on or about December 2018. The letter's inaccurate representation of the dates on which Plaintiff requested accommodations shows that Defendants were unfamiliar with when Plaintiff submitted her accommodation requests and with how long she had been waiting for a response. This ignorance is a reflection of Defendants' utter failure to engage in an interactive process with Plaintiff.

89.    In addition, the September 24, 2020 letter from Phillips stated: "As I also advised you via email, please submit updated medical documentation to this Office as soon as possible documenting any restrictions/limitations that you currently have including whether their estimated duration is permanent, temporary, or unknown."

90.    On October 6, 2020, Plaintiff emailed Phillips a formal request to have her leave extended beyond October 31, 2020. In addition, Plaintiff once again explained that she had previously submitted extensive medical information to HHC and that, due to Plaintiff's injuries, there was nothing to update. Plaintiff requested clarification as to whether Philillips was demanding new letters from Plaintiff's doctors or a resubmission of previous letters.

91.    On November 16, 2020, when Phillips had not responded to Plaintiff's October 6th email, Plaintiff emailed Phillips, again stating that she was requesting to have her leave extended.

92.    In addition, on November 16, 2020, Plaintiff submitted to Phillips updated doctors' letters in support of her reasonable accommodation requests, as follows: a letter dated October 29, 2020 from Dr. Babu stated that due to permanent medical conditions in Plaintiff's spine and her surgical history, he recommended an 8-hour shift in a 24-hour period, an ergonomic chair, and a 30-minute commute to work; a letter dated October 7, 2020 from Dr.

Kulick recommending that Plaintiff should not exceed 8 hours of work in a 24 hour period and that she should not lift overhead or lift more than 5 pounds; and a letter dated November 9, 2020 from Dr. Angela Monge (Plaintiff's psychologist) recommending that Plaintiff not return to work at Jacobi Medical Center/North Central Bronx Hospital and that she not be assigned to a night or evening shift.

93.     On December 9, 2020, when Phillips had not responded to Plaintiff's October 6th email and November 16th emails, Plaintiff emailed Phillips, again stating that she was requesting to have her leave extended. In addition, Plaintiffs provided Phillips with information about five positions for which she had applied.

94.     Phillips never responded to Plaintiff's October 6th, November 16th, and December 9th emails.

95.     On December 22, 2020, Plaintiff spoke with Blanche Greenfield on the phone and explained that Phillips had not responded to Plaintiff's October 6th, November 16th, and December 9th emails. Greenfield said she would contact Phillips and direct Phillips to respond to Plaintiff. However, Plaintiff heard nothing from Phillips. Therefore, on January 12, 2021, Plaintiff emailed Greenfield, explaining again that she had received no response to her October 6th, November 16th,and December 9th emails and that, since her leave had expired on October 31, 2021, she was AWOL and was therefore in danger of losing her workers compensation payments and becoming homeless.

96.     On January 27, 2021, Plaintiff received an email from Donna Moustapha, Esq., who explained that she had been assigned to handle Plaintiff's reasonable accommodation which was being reviewed by the Office of Equal Employment Opportunity.

97.    Finally, on February 12, 2021, Plaintiff received an email from Moustapha which referenced an attached letter that granted Plaintiff an extension of unpaid medical leave as a reasonable accommodation retroactive from November 1, 2020 through March 12, 2021. The email stated that the Office of EEO would be conducting an employment search consistent with Plaintiffs' restrictions and would be in touch regarding any potential interviews.

### Conclusion

98.    In violation of the disabilities statutes, HHC has failed to provide Plaintiff with reasonable accommodations of a minor nature that could allow her to return to work, a failure that is all the more shocking due to Plaintiff's strong work record at HHC. HHC's absence of good faith is incontrovertibly demonstrated by Stein's arrangement of interviews for Plaintiff for a position which required heavy lifting and a position which required a double shift, as well as by Phillips's failure to communicate with Plaintiff during the months after Plaintiff filed her EEOC Charge, which put HHC on notice of the gravity of its wrongdoing.

99.    Because Plaintiff assiduously filed with HHC all required medical information regarding her condition, HHC knew about her disability and her request for reasonable accommodations upon return from medical leave. HHC boasts that it has 42,000 employees and that it operates eleven acute care hospitals, five nursing homes, six diagnostic and treatment centers, and more than 70 community-based primary care sites. If HHC had been participating in the interactive process in good faith, as it was required to do by the disabilities statutes, and if HHC had not been motivated by age and disability discrimination and by gender and disability retaliation, it would have found, between December of 2018 and today's date, a clerical placement for Plaintiff with an ergonomic chair in a facility where her abuser was not stationed

in a position which required her to work no more than an 8-hour, day-time shift in a 24-hour period and did not require heavy lifting. These are not difficult accommodations to arrange. The fact that four prospective positions for which Plaintiff was well-qualified did not materialize demonstrates that suitable position existed and that HHC could have reasonably accommodated Plaintiff's needs.

100.    Plaintiff is seeking reinstatement in a position that accommodates her disabilities, as well as compensatory and emotional damages, under the Americans with Disabilities Act (ADA), the NYSHRL, and the NYCHRL, inasmuch as Defendants deliberately and intentionally, and for retaliatory and discriminatory reasons, impeded the interactive process that is supposed to occur when an employee requests an accommodation for a disability and otherwise discriminated and retaliated against her on the basis of disability. In addition, Plaintiff is seeking compensatory and emotional damages for age discrimination under the Age Discrimination in Employment Act (ADEA), the NYSHRL, and the NYCHRL  because, on information and belief, Defendants have favored younger, entry-level candidates due to Plaintiff's seniority and union rights to receive a higher salary than younger candidates. Finally, Plaintiff is seeking compensatory and emotional damages under Title VII, the NYSHRL, and the NYCHRL  for retaliation on the basis that Defendants' failure to reinstate her is part of a continuing pattern and practice of discrimination and retaliation for her complaints of sexual harassment.

## COUNT ONE:

### ADA DISCRIMINATION
### (Against HHC)

101.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

102.     By the actions described above, among others, Defendants have violated the ADA by refusing to provide Plaintiff with reasonable accomodations, inasmuch as  (1) Plaintiff is a person with a disability under the meaning of the ADA; (2) HHC is covered by the statute and had notice of her disability; (3) with reasonable accommodations, Plaintiff can  perform the essential functions of the job at issue; and (4) HHC has refused to make such accommodations.

103.     As Defendant HHC is aware, Plaintiff suffers from physical impairments that substantially limit one or more of her major life activities compared to most people in the general population. Due to having  permanent restrictions in her arms with respect to range of motion above her head and with respect to lifting, due to having permanent injuries to her right hand due to trigger finger, and due to her experiencing fatigue from over-exertion, she is significantly restricted in her ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. In addition, Plaintiff suffers from post traumatic syndrome due to sexual harassment which permanently limits her ability to work at the same job location as her harasser.

104.     Plaintiff can perform the essential function of her job with the following reasonable accommodations: (a) working hours that are limited to an 8-hour, daytime shift in a 24-hour period; (b) the provision of an ergonomic chair; (c) a position that does not require overhead lifting or lifting more than 5 pounds, (d) a position that is no more than thirty minutes travel-time from her home, and (e) assignment to a different location than the work location of the person who sexually harassed her. With these accommodations, Plaintiff can  enjoy equal benefits and privileges of employment as are enjoyed by  similarly situated employees without disabilities.

105.     On or about December 2018, Plaintiff requested a return to work with reasonable accommodations but, thus far, her request has been denied.

106.     By the actions described above, among others, Defendant impeded the interactive process that an employer must invoke in response to a request for a reasonable accommodation. Despite knowing of Plaintiff's disability and of her request for reasonable accommodations, HHC did not in good faith assist Plaintiff in seeking accommodations when Plaintiff could easily have been reasonably accommodated but for HCC's lack of good faith.

107.     In addition, by the actions described above, among others, Defendant has discriminated against Plaintiff on the basis of disability inasmuch as (1) HCC was subject to the ADA; (2) Plaintiff was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of his job, with a reasonable accommodation; and (4) she suffered adverse employment action because of her disability, inasmuch as, repeatedly and continuing to date, she has been denied positions for which she applied due to her disability.

108.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT TWO:

### ADA RETALIATION
### (Against HHC)

109.     Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

110.    By the actions described above, among others, Defendant has retaliated against Plaintiff in violation of ADA, inasmuch as (1) Plaintiff engaged in a protected activity; (2) HHC was aware of that activity; (3) Plaintiff suffered adverse employment actions; and (4) there was a causal connection between the protected activity and the adverse employment actions.

111.    As HHC was aware, Plaintiff engaged in protected activity on numerous occasion, by, among other things, requesting reasonable accommodations, complaining that she was not provided with reasonable accommodations, and by raising her PTSD disability (which resulted from sexual harassment) in complaints to HHC and before the Workers Compensation Board.

112.    As a result of Plaintiff's engaging in protected activity, HHC has denied her a reasonable accommodation.

113.    As a direct and proximate result of Defendant's retaliatory conduct in violation of the ADA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## **COUNT THREE:**

### **VIOLATION OF THE ADEA**
**(Against HHC)**

114.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

115.    HHC's continuing failure to reinstate Plaintiff is caused by discriminatioin based on her age. Because of her seniority, Plaintiff receives a higher rate of pay than someone in an entry level position in her title. In addition, her union contract entitles her to receive, upon return

to work, any and all union-negotiated raises that may have taken place while Plaintiff was on approved medical leave.

116.    By the actions described above, among others, Defendant has violated the ADEA by discriminating against Plaintiff with respect to the terms, conditions, or privileges of employment, because of her   age, inasmuch as (1) Plaintiff is over the age of forty and is therefore within the protected age group; (2) she was qualified for various positions available at HHC after she was authorized to return to work on or about December 2018; (3) she was not offered any of these positions; and (4) she was denied positions under circumstances giving rise to an inference of impermissible age discrimination. Upon information and belief, the positions were given to individuals who were substantially younger than Plaintiff.

117.    As a direct and proximate result of Defendant's discriminatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## COUNT FOUR:

### TITLE VII RETALIATION
### (Against HHC)

118.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

119.    Since September of 2015, when Rosa Durand sexually harassed  Plaintiff,  HHC has retaliated against Plaintiff for reporting sexual harassment. When Plaintiff complained about the sexual harassment, HHC retaliated against her by stripping her  of previous reasonable accommodations for her physical disabilities and moving  her into  unsuitable positions that

exacerbated her disabilities and allowed the sexual harassment to continue unchecked. When Plaintiff complained about these matters, she was further retaliated against by a further retaliatory placement, which exacerbated her injuries and forced her to take another medical leave.  In further retaliation for complaining about sexual harassment, that is continuing to date, HHC has  failed to reinstate Plaintiff in a suitable position that accommodates her disabilities and that separates her from her harasser.

120.    By the actions described above, among others, Defendant has retaliated against Plaintiff in violation of Title VII, inasmuch as (1) Plaintiff  engaged in a protected activity; (2) HHC  was aware of that activity; (3) Plaintiff suffered adverse employment actions; and (4) there was a causal connection between the protected activity and the adverse employment actions.

121.    As HHC was aware, Plaintiff engaged in protected activity on numerous occasions, by, among other things, complaining about sexual harassment in complaints to HHC, in complaints against HHC before the Workers Compensation Board, and in her request that she beassigned to work in a facility where her abuser does not work.

122.    As a result of Plaintiff's engaging in protected activity,

123.    As a result of Plaintiff's engaging in protected activity,  HHC punitively placed her in job positions that exacerbated her disabilities and exposed her to continuing sexual harassment, costructively forcing her to go out in medical leave, and then, upon Plaintiff being deemed ready to return to work, continuing the pattern of unremedied retaliation by refusing to facilitate her return to work in a facility where her abuser does not work.

124.    As a direct and proximate result of Defendant's retaliatory conduct in violation ofTitle VII, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an

award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## **COUNT FIVE:**

### **NEW YORK STATE HUMAN RIGHTS LAW: DISCRIMINATION**
### **(Against All Defendants)**

125.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

126.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her disability in violation of the NYSHRL by refusing her a reasonable accommodation and subjecting her to continuing discrimination based upon disability.

127.    By the actions described above, among others, Defendants also discriminated against Plaintiff on the basis of her age  in violation of the NYSHRL.

128.     The Individual Defendants  are individually liable under the State Human Rights Law inasmuch as they  had the  power to do more than carry out personnel decisions made by others and are therefore directly responsible for denying Plaintiff's  reasonable accommodation request and for discriminating against her based on disability and age.

129.    The Individual Defendants are also liable as aiders and abettors under the State Human Rights Law inasmuch as they aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of New York State Executive Law, Human Rights Law, § 296(6).

130.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

## COUNT SIX:

### NEW YORK STATE HUMAN RIGHTS LAW: RETALIATION
### (Against All Defendants)

131.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

132.    By the actions described above, among others, Defendants retaliated against Plaintiff for engaging  in protected activity related to disability. Plaintiff engaged in protected activity by requesting reasonable accommodations, by complaining that she was not provided with reasonable accommodations, and by raising her PTSD disability (which resulted from sexual harassment) in complaints to HHC and before the Workers Compensation Board.

133.    By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activity related to gender. Plaintiff engaged in protected activity by complaining about sexual harassment in complaints to HHC, in complaints against HHC before the Workers Compensation Board, and in her request that she be assigned to work in a facility where her abuser does not work.

134.    As a result of Plaintiff's engaging in protected activity, HHC punitively placed her in job positions that exacerbated her disabilities and exposed her to continuing sexual harassment, costructively forcing her to go out in medical leave, and then, upon Plaintiff being

deemed ready to return to work, continuing the pattern of unremedied retaliation by denying her the reasonable accommodations needed to facilitate her return to work.

135.    The Individual Defendants  are individually liable under the State Human Rights Law inasmuch as they  had the  power to do more than carry out personnel decisions made by others and are therefore directly responsible for retaliating against Plaintiff for her complaints about gender-based and disability-based discrimination..

136.    The Individual Defendants are also liable as aiders and abettors under the State Human Rights Law inasmuch as they aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of New York State Executive Law, Human Rights Law, § 296(6).

137.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

## <u>COUNT SEVEN:</u>

### NEW YORK CITY HUMAN RIGHTS LAW: DISCRIMINATION
### (Against All Defendants)

138.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

139.    By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of her disability in violation of the NYSHRL by refusing her a reasonable accommodation and subjecting her to continuing discrimination based upon disability.

140.    By the actions described above, among others, Defendants also discriminated against Plaintiff on the basis of her age  in violation of the NYCHRL.

141.    The Individual Defendants  are individually liable under the City Human Rights Law inasmuch as they  had the  power to do more than carry out personnel decisions made by others and are therefore directly responsible for denying Plaintiff's  reasonable accommodation requests and for discriminating against her based on disability and age.

142.    The individual Defendants are liable as aiders and abettors under the City  Human Rights Law inasmuch as they aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of NYC Administrative Code §8-107.

143.    Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages against the Individual Defendants in their individual capacity.

144.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

## COUNT EIGHT:

### NEW YORK CITY HUMAN RIGHTS LAW: RETALIATION
### (Against All Defendants)

145.    Plaintiff incorporates by reference herein the allegations in the above paragraphs of the Complaint as though fully set forth herein.

146.    By the actions described above, among others, Defendants retaliated against Plaintiff for engaging  in protected activity related to disability. Plaintiff engaged in protected activity by requesting reasonable accommodations, by complaining that she was not provided with reasonable accommodations, and by raising her PTSD disability (which resulted from sexual harassment) in complaints to HHC and before the Workers Compensation Board.

147.    By the actions described above, among others, Defendants retaliated against Plaintiff for engaging in protected activity related to gender. Plaintiff engaged in protected activity by complaining about sexual harassment in complaints to HHC, in complaints against HHC before the Workers Compensation Board, and in her request that she assigned to work in a facility where her abuser does not work.

148.    As a result of Plaintiff's engaging in protected activity, HHC punitively placed her in job positions that exacerbated her disabilities and exposed her to continuing sexual harassment, costructively forcing her to go out in medical leave, and then, upon Plaintiff being deemed ready to return to work, continuing the pattern of unremedied retaliation by denying her the reasonable accommodations needed to facilitate her return to work.

149.    The Individual Defendants  are individually liable under the City Human Rights Law inasmuch as they  had the  power to do more than carry out personnel decisions made by others and are therefore directly responsible for retaliating against Plaintiff for her complaints about  disability-based and gender-based discrimination.

150.    The Individual Defendants are also liable as aiders and abettors under the City Human Rights Law inasmuch as they aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct in violation of NYC Administrative Code §8-107.

151.    Defendants' unlawful retaliatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages against the Individual Defendants in their individual capacity.

152.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendants as follows: Plaintiffs demand judgment against Defendants for, where applicable, all compensatory, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, reinstatement in a position that accommodates her disabilities, and any other relief or damages permitted by law. It is further requested that this Court grant reasonable attorneys fees, the costs and disbursements of this action, pre- and post-judgment interest as applicable; and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: New York, New York
     March  2, 2021

ANNE LEAHEY LAW, LLC

By _____

Anne C. Leahey
(legal@anneleaheylaw.com)
17 Dumplin Hill Lane
Huntington, New York 11743
(631) 553-3708

## VERIFICATION

STATE OF NEW YORK          )
                           ss.:
COUNTY OF BRONX            )

CRYSTAL CRUZ, being duly sworn, deposes and says:

I am a party to the within action. I have read the foregoing Verified Complaint and know the contents thereof; and the same are true to my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and, as to those matters, I believe them to be true.

_____
CRYSTAL CRUZ

Sworn to before me this
2nd day of March 2021

_____
NOTARY PUBLIC

LEIAQUAT A KHAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01KH6024624
Qualified in Queens County
Commission Expires May 10, 2023

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

December 14, 2020

Ms. Crystal Cruz
c/o Anne C. Leahey, Esquire
Anne Leahey Law
17 Dumplin Hill Lane
Huntington, NY  11743

Re:  EEOC Charge Against New York City Health & Hospitals
    No. 520202004998

Dear Ms. Cruz:

Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action against the above-named respondent under:  Title I of the Americans with Disabilities Act of 1990,  42 U.S.C. 12111, et seq., and,  Title V, Section 503 of the Act, 42 U.S.C. 12203.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Eric S. Dreiband
Assistant Attorney General
Civil Rights Division

by        /s/ Karen L. Ferguson
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: New York District Office, EEOC
  New York City Health & Hospitals

EEOC Form 161-B (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:   **Crystal Cruz**<br>**100 Asch Loop**<br>**Apt 21f**<br>**Bronx, NY 10475** | From:   **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2020-04998** | **Perry Canales,**<br>**Supervisory Investigator** | **(929) 506-5318** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☐    More than 180 days have passed since the filing of this charge.

☐    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐    The EEOC is terminating its processing of this charge.

☐    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☒    The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐    The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Perry A, Canales

Digitally signed by Perry A, Canales
DN: cn=Perry A, Canales, o=Equal
Employment Opportunity Commission,
ou=New York District Office,
email=perry.canales@eeoc.gov, c=US
Date: 2020.12.14 11:58:42 -05'00'

For

12/14/2020

Enclosures(s)

**Judy A. Keenan,**
**District Director**

*(Date Mailed)*

cc:

**NEW YORK CITY HEALTH AND HOSPI**
**125 Worth Street Rm 514**
**New York, NY 10013**

Enclosure with EEOC
Form 161-B (11/16)

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request** **within 6 months** **of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Enclosures(s)

cc:

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA):**   The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability.  *However, these terms are redefined, and it is easier to be covered under the new law.*

<u>**If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.**</u>

**"Actual" disability or a "record of" a disability (note: if you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability):**

➢ **The limitations from the impairment no longer have to be severe or significant** for the impairment to be considered substantially limiting.

➢ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)),  **"major life activities"  now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.**

➢ **Only one** major life activity need be substantially limited.

➢ With the exception of ordinary eyeglasses or contact lenses, **the beneficial effects of "mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

➢ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or "**in remission**" (e.g., cancer) is a disability if it **would be substantially limiting when active**.

➢ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage:**

➢ An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

➢ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

➢ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively *BOTH* transitory (lasting or expected to last six months or less) *AND* minor.

➢ A person is not able to bring a failure to accommodate claim *if* the individual is covered only under the "regarded as" definition of "disability."

*Note:   Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment.  Beyond the initial pleading stage, some courts will require specific evidence to establish disability.*   For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4701*
*Washington, DC 20530*

December 14, 2020

Ms. Crystal Cruz
c/o Anne C. Leahey, Esquire
Anne Leahey Law
17 Dumplin Hill Lane
Huntington, NY  11743

Re:  EEOC Charge Against New York City Health & Hospitals
      No. 520202004998

Dear Ms. Cruz:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and the Commission has determined that it will not be able to investigate and conciliate that charge within 180 days of the date the Commission assumed jurisdiction over the charge and the Department has determined that it will not file any lawsuit(s) based thereon within that time, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                              Sincerely,


                              Eric S. Dreiband
                              Assistant Attorney General
                              Civil Rights Division


                    by      /s/ Karen L. Ferguson
                              Karen L. Ferguson
                              Supervisory Civil Rights Analyst
                              Employment Litigation Section


cc: New York District Office, EEOC
   New York City Health & Hospitals